OF THE

## STATE OF NEW JERSEY,

### ON APPEAL FROM THE COURT OF CHANCERY,

AND PREROGATIVE COURT.

NOVEMBER TERM, 1891.

PATRICK CORRIGAN, appellant,

*v.*

MARY PIRONI, respondent.

A Roman Catholic woman, old, eccentric and illiterate, devised certain land to her spiritual adviser, a priest. She afterwards revoked her will, and by deed, reserving to herself a life estate, conveyed the land as a gift to the priest, who thereupon gave her $1,000, to be expended in improving the land.—*Held*, that the burden was on the priest to prove that his grantor was fully apprised of the legal effect of her act when she signed the deed, and that she was not influenced by her confidential relations with him. Because of the failure of such proof the conveyance must be set aside and the money paid by the priest refunded.

On appeal from a decree advised by Vice-Chancellor Pitney, whose opinion is reported in *Pironi* v. *Corrigan, 2 Dick. Ch. Rep. 135.*

*Mr. William E. Skinner* and *Mr. Theodore Runyon*, for the appellant.

*Mr. William M. Johnson*, for the respondent.

The opinion of the court was delivered by

BEASLEY, C. J.

The bill in this case was exhibited by Mary Pironi, the respondent, to set aside a conveyance of land made by her to the respondent, Patrick Corrigan, the appellant. The equity alleged is that the complainant's husband treated her cruelly and being desirous of a separation she applied to the appellant, who is a Catholic priest, to effect that purpose; that he finally proposed to her that he would bring about such separation if she would convey to him her real property, subject to her use for life, and that, assenting to this proposition, she made the conveyance in question; that at the time of its execution the appellant produced a roll of bills which he offered her, but before she understood what it was, and without any explanation, he quickly took the bills again into his possession; that she has been informed that the appellant claims to have paid her, at the time referred to, the sum of $1,000, which is the consideration mentioned in the deed, but she denies that she received that or any other sum, and affirms that the roll of bills shown to her was intended as an apparent but unreal consideration of the conveyance; that the respondent failed to fulfill his promise to rid her of her husband.

The answer, to state it in brief, denies that the procurement of a separation between the respondent and her husband was the consideration of the conveyance, and alleges that she had previously devised this property to him, and that having destroyed the will, she put her original purpose in the form of the conveyances adopted and which pass a remainder to him in fee, limited on an estate for life in herself, and that he paid her, at the time of the transaction, the sum of $1,000.

On these pleadings, in connection with the proofs, his honor, the vice-chancellor, decided against the appellant the two points.

Corrigan v. Pironi.

constituent of the litigation, namely, that the conveyance should be vacated, and that the appellant had not paid the $1,000 in dispute.

This decree, so far as it relates to the cancellation of this deed, we think cannot be disturbed. After a careful examination of the facts in proof, it appears clear to me that the appellant's version in this respect of this transaction is the correct one. He had a right to believe, as he says he did, that his undertaking to do what he could to prevent the husband of the respondent from longer molesting her, was no part of the consideration of the conveyance of this property. She had antecedently made a will in his favor, giving him her entire estate, and not being satisfied, for some reason that does not appear, with this instrument, she had destroyed it, and thereupon proposed to bestow upon him these lands as a gift, and that, in view of such proffered benefaction, he voluntarily promised to give her $1,000, to be applied in the renovation or improvement of the premises thus to be donated. This is the sense in which the appellant asserts that he understood the affair, and, as has been said, the circumstances fully justified such construction. But while this conclusion is an absolute justification of the moral rectitude of the appellant in this business, it does not follow that it is a vindication of its legality. The respondent was, in point of religion, a Roman Catholic, and the appellant a priest of that order, the consequence being that a relationship existed between them which, in a legal point of view, is deemed confidential. In the presence of such a spiritual ascendency, all gifts or benefactions from the subject of such an influence to the possessor of it, have been frequently avoided on grounds of public policy, and without any suspicion that fraud or imposition of any kind had been practiced. Such a situation in itself naturally suggests the idea of a donor possessed with a general purpose, without thought or self-guidance as to the mode of its execution, and ready to adopt, without hesitation, any suggestion on the subject. In such a posture of things, it is incumbent on the donee to show not only that his own conduct has been fair and wholly unobjectionable, as has been shown in this case, but to show further that the donor has

39

not acted from the influence of an implicit confidence, rather than from the exercise of his own reason.

It cannot be said that in the present instance such an exposition has been made by the appellant. This donor was between seventy and eighty years of age; she was ignorant, eccentric and entirely illiterate, for she could neither read nor write. The first suggestion of making this conveyance occurred in a private conversation between herself and her donee, no one else being present. Her instructions to draw the necessary instruments were conveyed to her own lawyer by the donee, she having no personal interview with such scrivener; and the papers were finally executed in the presence and under the supervision of the counsel of the donee, so that from first to last, with respect to this all-important transaction, she had no adviser of any kind, either legal or lay. Indeed, there is no reason to believe that from the commencement of the business to its close she had spoken to anyone about it but the appellant himself. The crucial question, therefore, presses, did this woman, thus old and ignorant, know the legal effect of the act she then did? Was she aware that a conveyance, unlike a will, was irrevocable? It seems clear that she could have gained such knowledge at the time she executed the instrument only from the counsel of the appellant, and that counsel refused to testify in an absolute form to such fact. The explicit question was thus put to him: "Did you explain to her that she could not alter that after she signed the papers; that she could not alter it; or didn't that occur to you?" And the answer was: "I think I did; I won't be positive that I said it in that way; I think I did, though." Although much pressed, the witness left this subject in this uncertainty.

It is entirely plain that the burthen was on this appellant to show, as I think, by plain proof, that his donee was aware that she was, on the occasion in question, divesting herself, in an unchangeable form, of her title in this property. No reason appears why she should have desired to take such a course. It should be added that, from her subsequent conduct, the reasonable

inference seems to be that she was under the belief that it was in her power at any time to revoke this gift.

Under such circumstances, it is the opinion of this court that the decree in the court below, to the extent that it directs the cancellation of these conveyances, should be affirmed.

But on the second branch of this controversy this court differs wholly with the view of the case as it is expressed in the decree before us. In our opinion, it is proved by evidence that seems to us absolutely conclusive, that the sum of $1,000, at the time of the execution of these conveyances, was paid to the respondent by the appellant and was retained by her. The appellant himself testifies to this payment. The persons present were himself, the respondent and Judge Garrick, who was overseeing the transaction. The appellant testifies that he drew the larger part of the money paid from the bank on the day in question, and corroborates this statement by the production of his check-book; that he took out a roll of bank bills, counted them aloud, the sum total being announced as $1,000, and handed the bills thus counted to the respondent, who took them and retained them.

This narration was attested to by Judge Garrick, whose testimony throughout was marked by caution and accuracy. He says: "He had some money in his hands and counted out the $1,000, and paid it over to Mary [respondent]; I did not count the money; I heard him say so, that is all." Again, he says: "I remember Father Corrigan handed her the amount, and he was asked, 'You are quite sure that $1,000 was mentioned as the amount,' and his reply was, 'Yes, sir.'" The question was then put to him: "Did you see any indication of its [the money] being handed back to Father Corrigan?" The reply was: "No, sir."

The narration that the respondent, as a witness, made of this transaction was this: She was asked: "Did he give you any money?" and her answer was: "He gave me $2; I can swear on the Bible this minute that he took it that fast away [making a motion to indicate how fast], and he said at Fort Lee the other day he gave me a thousand dollars." The question was put: "Do you recollect Father Corrigan producing a roll of bills to you?"

and her reply was: "Who can swear to it; $1 or $2, or so; put them in my hand, and when he went to show me the paper, he says, 'Show me that;' taking the bills out of my hand." She was further asked with respect to the money thus retaken by him, whether he put it in his pocket or pocket-book: "I don't know; a couple of dollars; what did I care; he didn't throw them on the ground, anyway, for I didn't find them on the ground; oh, my God, I warrant you he didn't put them on the ground."

And such, on this important subject, is the version of the affair given by the respondent. It is in glaring contradiction of the testimony of the appellant and Judge Garrick, and by force of such opposition it vanishes as a theory without substance from the case. It is proper, further, to say in this connection, since the subject so vitally affects the truth and honesty of the appellant, that from my careful examination of the testimony in this record, my mind is completely satisfied that this respondent has not the ability to tell the truth where her feelings are excited or her interest is involved; it seems to me that it is absolutely certain that she has falsified every important particular to which her attention, as a witness, was directed.

With respect to the testimony of Ellen Catello, which it was claimed corroborated the contention of the respondent on this subject, it seems necessary to say a few words. This witness testified that the appellant came to Fort Lee to see the respondent, and in an interview with her stated that he had never paid her this $1,000 or any other money. That the appellant made such an admission as this is almost incredible, for such conduct would be out of harmony with any reasonable theory of the case; but, in fact, this witness on this subject is contradicted not only by the appellant, but also by the respondent herself, for while the witness declares that the appellant at Fort Lee admitted that he had not paid this money, the respondent testified that he, at Fort Lee, alleged to her that he had paid her the $1,000 in question.

From the evidence as it stands before us, this court is entirely satisfied that the $1,000 referred to was paid by the appellant to the respondent, and that consequently this decree on this subject.

should be reversed, and that the repayment of this $1,000, with interest from the time of its receipt by the respondent, should be directed to be repaid at the time of the reconveyance of the lands in question, as heretofore indicated.

Neither party is entitled to costs, either in the court of chancery or in this court.

The decree before us must be reversed, so that it may be remodeled in conformity to the views just expressed.

